UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ROBERT P. BASTON, <br><br>Plaintiff, <br><br>v. <br><br>INDIANA STATE OF, et al., <br><br>Defendants. | CAUSE NO. 3:18-CV-791-JD-MGG |

OPINION AND ORDER

Robert P. Baston, a prisoner without a lawyer, proceeds on an Eighth Amendment claim for damages against Wexford Medical Services and Corizon, LLC, for the policy or practice of refusing to provide medication that would cure Hepatitis C to afflicted inmates and an Eighth Amendment claim for injunctive relief against the Director of the Indiana Department of Correction (IDOC), Robert E. Carter, Jr., to obtain medical treatment for Hepatitis C, as required by the Eighth Amendment. Defendants filed for summary judgment. ECF 82, 84, 88. Baston responded, and defendants have replied. ECF 126, 131, 132, 133.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010).

When Baston entered the Indiana Department of Correction in 2010, routine screening revealed he had Hepatitis C. ECF 87-4 at 20, 22. Hepatitis C is a virus that primarily affects the liver. ECF 85-2 at ¶ 8. For some people, the virus goes away on its own soon after infection. *Id.* at ¶ 9. The others develop chronic Hepatitis C, which over time can damage the liver. ECF 87-1 at ¶ 6. Up to 30 percent of those cases develop severe and permanent scarring of the liver (called cirrhosis) over a 20- to 30-year period. *Id.* The progression of the virus is monitored by looking for physical symptoms, including abdominal pain, bleeding, bloating, nausea, fatigue, fever, loss of appetite, sudden weight loss, swollen blood vessels, and yellow skin or eyes, ECF 85-2 at ¶ 10, as well as signs of liver scarring (called fibrosis), ECF 87-1 at ¶ 6. Fibrosis levels can be roughly gauged by watching for elevated liver enzymes through blood tests. ECF 85-2 at ¶¶ 9-10. Of particular value is a person's AST-to-platelet ratio index (APRI) score, which uses the liver enzyme, AST, value and platelet count from a blood draw in a formula that produces a number medical personnel use to estimate the degree of fibrosis in the liver. ECF 87-3 at 8. An APRI score greater than 2.0 strongly suggests cirrhosis is present. *Id.* at 10. There was no effective treatment for HCV until direct-

acting antivirals (DAAs) were approved for the treatment of patients with Hepatitis C within the last 5-10 years. ECF 85-2 at ¶ 11; ECF 87-1 at ¶ 7.

While incarcerated in the IDOC, Baston's medical care was provided by Corizon until April 1, 2017, when Wexford took over as the medical care provider. ECF 85-2 at ¶ 5. Baston was enrolled in the Chronic Care Clinic (CCC), which meant that a health care provider would see him every 90 days for a health screening and lab work. ECF 87-1 at ¶ 12.

His medical records show a history of refusing to cooperate with his health care providers concerning his Hepatitis C (as well as other medical issues not relevant here). In 2011, Baston refused to consent to a blood draw four times. ECF 87-7 at 110, 128. The records do not mention any CCC visits offered or refused. His records for 2012 do not contain any reference to blood draws or CCC visits. He attended two CCC visits in 2013 but refused to go to the third. ECF 87-4 at 277-80, 288-90; ECF 87-5 at 9. His physical exam showed no sign of liver dysfunction. *Id.* That year he refused blood draws related to his Hepatitis C. ECF 87-4 at 277, 288.

In 2014, Baston refused all CCC visits and lab work. ECF 87-6 at 52-53, 151-52, 156, 171, 173, 193, 205. In 2015, he refused his first CCC visit but attended the next three. *Id.* at 222, 232-39, 246-48; ECF 87-7 at 119-21. He had no physical symptoms of liver damage. *Id.* He refused all labs. ECF 87-6 at 210, 212, 220, 240; ECF 87-7 at 2, 295.

Baston attended all his CCC visits in 2016. ECF 87-8 at 211-13; ECF 87-9 at 20-22, 66-68. He participated in two blood draws, ECF 87-9 at 25-26; ECF 87-20 at 3-4, but refused one, ECF 87-9 at 63-64. At his February 2016 visit, the doctor noted, "The

problem is worsening. Severity level is mild-moderate," ECF 87-8 at 211, but there were no physical symptoms present at any of his visits. His APRI score in May 2016 was 0.218, and his June 2016 APRI score was 0.169. ECF 87-1 at ¶ 13; ECF 87-11 at 196.

In 2017, Baston refused two CCC visits, ECF 87-9 at 80, 82-83, 215, and attended one, *id.* at 283-84, 293-94. No symptoms of Hepatitis C were noted. *Id.* at 283. He refused all labs that year. *Id.* at 79, 81, 84-85, 187, 294; ECF 87-10 at 292.

In 2018, Baston attended three of the four CCC visits scheduled. ECF 87-11 at 194-97, 230-33; ECF 87-14 at 200; ECF 87-15 at 108. At his February 2018 CCC visit, he reported every symptom of HCV, ECF 87-11 at 210, but he did not report any at his later visits. He submitted to one blood draw, *id.*, but refused the next three, ECF 87-12 at 125; ECF 87-15 at 23, 25, 183.

Baston attended his CCC visit in February 2019, where it was noted that his Hepatitis C was clinically stable and that his labs from his last blood draw a year ago showed that his liver enzymes, AST and AKT, had levels within normal limits. ECF 87-15 at 252. He did not submit to a blood draw. *Id.*

Baston's treatment for Hepatitis C was at all times governed by IDOC's Health Care Services Directive (HCSD) 3.09, which Corizon and Wexford were contractually bound to follow. ECF 85-2 at ¶¶ 6-7; ECF 87-1 at ¶ 5. HCSD 3.09, in turn, referred to the Federal Bureau of Prison's (BOP) Guidance for the Evaluation and Management of Chronic Hepatitis C Virus Infection.[1] ECF 87-3. The BOP guidance prioritized inmates'

---

[1] The version of HCSD 3.09 attached as an exhibit has an effective date of June 1, 2015, before Wexford took over health care for IDOC but in the middle of Corizon's tenure. ECF 87-2 at 1. Baston does

4

access to treatment based on their degree of liver damage, with those having more severe damage receiving higher priority.² As relevant here, the BOP guidance used an inmate's APRI score to assign a priority level. ECF 87-3 at 12. An APRI score greater than 2.0 qualified an inmate as high priority for treatment; an APRI score greater than 1.0 qualified an inmate as intermediate priority; and an APRI score under 1.0 meant an inmate was low priority. *Id.*

In addition to these criteria, to be considered for treatment, inmates had to fulfill other requirements, including "[d]emonstrate a willingness and an ability to adhere to a rigorous treatment regimen . . . ." ECF 87-3 at 13. The BOP guidance provided an exception to those classification criteria if there was "a compelling or urgent need for the treatment, such as evidence for rapid progression of fibrosis, or deteriorating health status from other conditions." *Id.* at 12.

This policy was found to violate the Eighth Amendment in *Stafford v. Carter*, No. 1:17-cv-289-JMS-MJD, 2018 WL 4361639, at *11, (S.D. Ind. Sept. 13, 2018), a class action against Robert E. Carter, Jr., comprised of "all current and future prisoners in IDOC custody who have been diagnosed, or will be diagnosed, with chronic HCV, and for whom treatment with DAA medication is not medically contraindicated." The Southern District of Indiana approved a settlement in which all members of the class will receive

---

not dispute that some version of the policy was in effect throughout his entire incarceration, and the court assumes that is was substantially like the attached version. Likewise, the attached BOP Guidance has an effective date of October 2016, but the court assumes similar versions were previously in effect. ECF 87-3 at 1.

² There are other ways to be designated as intermediate or high priority, such as having certain other diseases or conditions present, but these are inapplicable to Batson.

5

DAA treatment by July 1, 2023, prioritizing those with higher-stage progression of the virus first, and entered final judgment on January 2, 2020. *Stafford*, No. 1:17-cv-289-JMS-MJD at ECF 282, 283 (Jan. 2, 2020) (decision attached here as an exhibit found at ECF 90-10). Baston is a member of that class, and therefore the claim against Carter for injunctive relief is barred by res judicata. Res judicata prevents a party from relitigating a claim that a court has already decided when three conditions are met: "(1) an identity of the causes of action; (2) an identity of the parties or their privies; and (3) a final judgment on the merits." *Kilburn-Winnie v. Town of Fortville*, 891 F.3d 330, 332-33 (7th Cir. 2018).

Here, the causes of action are identical. "[T]he test for an identity of the causes of action is whether the claims arise out of the same set of operative facts or the same transaction." *Bernstein v. Bankert*, 733 F.3d 190, 226 (7th Cir. 2013). Both *Stafford* and this case concern whether IDOC's treatment of inmates with Hepatitis C under HCSD 3.09 is unconstitutional under the Eighth Amendment. As for the identities of the parties, Carter was a defendant in both actions. Though Baston was not a named plaintiff, he was a member of the class and "in a class action a person not named as a party may be bound by a judgment on the merits of the action, if she was adequately represented by a party who actively participated in the litigation." *Thorogood v. Sears, Roebuck and Co.*, 678 F.3d 546, 550 (7th Cir. 2012) (alterations omitted) (quoting *Hansberry v. Lee*, 311 U.S. 32,

41 (1940)). Finally, there was a final judgment on the merits in *Stafford*. Therefore, Baston's claim for injunctive relief against Carter is barred by res judicata.[3]

Turning to Corizon and Wexford, corporations that contract with government entities to provide essential government services to inmates can be held liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for deliberate indifference. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). *Monell* does not allow liability based on unconstitutional acts of Corizon or Wexford employees, but instead based on actions attributable to the organization as a whole. *Id.* There are several ways in which a plaintiff may prove this:

> First, she might show that the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Second, she might prove that the constitutional deprivation was visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels. Third, the plaintiff might be able to show that a government's policy or custom is made by those whose edicts or acts may fairly be said to represent official policy. As we put the point in one case, a person who wants to impose liability on a municipality for a constitutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government. Either the content of an official policy, a decision by a final decisionmaker, or evidence of custom will suffice.

*Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc) (quotation marks, citations, and internal alterations omitted). Thus, if Baston cannot point to an official Corizon or Wexford policy that was itself unconstitutional, he may prove liability through "a series of bad acts" that create the inference that "the policymaking level of government was bound to have noticed what was going on and by failing to do

---

[3] Carter also argued that injunctive relief against him is moot because Baston's most recent lab results from February 2020 showed he was negative for Hepatitis C RNA, and therefore he does not have Hepatitis C anymore. ECF 85-4. However, Baston disputes that conclusion with a copy of that lab report, which states, "A negative result does not rule out infection." ECF 102 at 6. Carter does not address this in his reply and seems to have abandoned this argument.

anything must have encouraged or at least condoned . . . the misconduct of subordinate officers." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004). "[M]ore evidence than a single incident" is generally required to show a pervasive practice. *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005).

It is undisputed that neither Corizon nor Wexford were involved in drafting HCSD 3.09 and that both were contractually required to follow it. Thus, the policy was not "officially adopted and promulgated by that body's officers," *Glisson*, 849 F.3d at 379, and so Corizon and Wexford cannot be held liable based on the policy itself. Moreover, Baston has not pointed to evidence that anyone from Corizon or Wexford were involved in selecting which inmates received DAA treatment. *See Stafford*, 2018 WL 4361639, at *15 (holding IDOC, and not Wexford, responsible for HCSD 3.09 because "[IDOC] Defendants seek to control physicians' treatment decisions by providing parameters within which they should consider an individual eligible for HCV treatment at all" and "IDOC's policy is intended to govern the treatment of HCV-infected inmates—otherwise physicians would be left to simply apply their own medical judgment as to the proper course of treatment for each inmate"); *Hatfield v. Hobson*, No. 2:18-cv-464-JMS-MJD, slip op. at 15, (S.D. Ind. Sept. 22, 2020) (granting summary judgment for Corizon and Wexford on inmate's Hepatitis C policy and practice claim because they "were bound by the constraints of IDOC policy" and inmate's care fell within the policy's guidelines); *see also Davis v. Wetzel*, No. 1:18-cv-804, 2020 WL 3642382, at *7-8 (M.D. Pa. July 6, 2020) (granting summary judgment on *Monell* claim for prison's Infectious Care Nurse and former Corrections Health Care

Administrator because it was undisputed that the DOC established the Hepatitis C policy, the Hepatitis C Treatment Committee decided which inmates received DAA treatment, and neither the nurse nor the administrator were involved in establishing the policy or participating on the committee).

Corizon or Wexford, however, could be liable based on a custom of blindly following HCSD 3.09 without consideration of an inmate's individual circumstances. *See Roe v. Elyea*, 631 F.3d 843, 860 (7th Cir. 2011) ("Here, the FBOP Guidelines [for treating Hepatitis C] employed by Dr. Elyea as a guide in formulating and implementing [Illinois Department of Corrections'] policy were no doubt a useful tool and, as a general matter, might assist in assessing treatment options with respect to a disease that is slow-progressing and highly dangerous or fatal, over time, in only a small percentage of infected persons. . . . With respect to an individual case, however, prison officials still must make a determination that application of the protocols result in adequate medical care."). However, Baston has pointed to nothing in his medical records that would suggest he needed more immediate access to DAA treatment. It is undisputed that when Baston submitted to blood draws, his APRI scores were significantly low and not consistent with a patient suffering acute liver disease or cirrhosis. ECF 85-2 at ¶ 18. He points to no other circumstances that would suggest *he* needed faster access to DAA treatment, let alone a widespread custom across IDOC of Wexford or Corizon ignoring individual circumstances of other inmates.

For these reasons, the court:

9

(1) GRANTS the defendants' motions for summary judgment (ECF 82, 84, 88); and

(2) DIRECTS the clerk to enter judgment in favor of the defendants and to close this case.

SO ORDERED on February 23, 2021

/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT